## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| SHEBA HOUSKIN, individually and as | ) | |
| Special Administrator of the Estate of | ) | |
| Emmanuel Deon Reeves, deceased | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff | ) | |
| v. | ) | No. _____ |
| | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| and SINAI HEALTH SYSTEM d/b/a MT. | ) | |
| SINAI HOSPITAL, | ) | |
| | ) | |
| Defendants, | | |

## COMPLAINT FOR DAMAGES

COME NOW the plaintiff, SHEBA HOUSKIN, by her attorneys, Beam & Raymond, and

for her cause of action against the defendants, UNITED STATES OF AMERICA and SINAI

HEALTH SYSTEM d/b/a MT. SINAI HOSPITAL, do hereby complain to this Honorable Court

as follows:

## JURISDICTION AND VENUE

1.      The PLAINTIFF is SHEBA HOUSKIN, both individually and as the Special

Administrator of the Estate of EMMANUEL DEON REEVES, deceased. SHEBA HOUSKIN is

the natural mother of the deceased minor, EMMANUEL DEON REEVES (hereinafter baby

EMMANUEL). At all pertinent times herein, SHEBA HOUSKIN was a resident of the State of

Illinois and the County of Cook and lived within the Northern District of Illinois (District).

2.      Defendant United States of America is named as a Defendant pursuant to the

requirements of the Federal Tort Claims ACT (FTCA) 28 U.S.C. § 2671, as its agents, including

1

but not limited to Kalpana Singh, M.D., Osaretin Oronsaye, M.D., Erliene Bautista, M.D., Sarika Arora, M.D., and Connie Mooreland, M.D. were employed by and/or were agents of Access Community Health Network, a Federally Qualified Healthcare Center, as an obstetrician/gynecologist, and were acting within the scope of their employment at all times relevant to this Complaint within this District.

3.      At all times pertinent herein including but not limited to on and before August 10, 2015 through August 12, 2015 the defendant, MT. SINAI HOSPITAL (hereinafter "DEFENDANT HOSPITAL"), was a professional corporation engaged in the business of providing medical care to members of the public, including the PLAINTIFF and PLAINTIFF'S son, Emmanuel Deon Reeves, by and through nurses and physicians, including the defendant, KALPANA SINGH, M.D., and others, doing business in the State of Illinois and the County of Cook, which resides within this District.

4.      At all times pertinent herein, the DEFENDANT HOSPITAL did employ and/or retain as agents, either actual or apparent, the following individuals, including but not limited to, Kalpana Singh, M.D., Osaretin Oronsaye, M.D., Erliene Bautista, M.D., Sarika Arora, M.D., Connie Mooreland, M.D., Robert Para, M.D., Josef Blankstein, M.D., Leonard Feinstein, M.D., Abbie Mincks, M.D., Olufeyisayo Taiwo, M.D., Jeanne Chan, M.D., Janet Vincent, R.N., Naomi Brown, R.N., Rudea Downs, R.N., Lilibet Villafor, R.N.C., Sonya Love, R.N., and Carol Frey, R.N., who were acting as the agent, servant or employee of the DEFENDANT HOSPITAL and acting within the scope of said employment and/or agency, whether actual or apparent, and thereby said DEFENDANT HOSPITAL, is vicariously liable for the acts and omissions of the above listed healthcare providers.

5.      The acts of negligence as alleged in this Complaint all took place within the District.

2

6.     An action was filed in Illinois State Court, captioned *Sheba Houskin, individually and a Special Administrator of the Estate of Emmanuel Deon Reeves, deceased v. Sinai Health System d/b/a Mt. Sinai Hospital and Kalpana Singh, M.D.*, Case No: 2015-L-010348. Subsequently, the state court case was removed to this Court and the United States was substituted in as a Defendant due to Dr. Singh's status as a federal employee. The United States was dismissed from the action.

7.     An administrative tort claim was filed with HHS on February 29, 2016 and has been denied expressly or by inaction thereby exhausting PLAINTIFF'S administrative remedy.

8.     Jurisdiction is conferred upon this Court pursuant to the Federal Tort Claims Act (FTCA) 28 U.S.C. § 1346(b)(1), §1402(b), § 2679(d)(2), and § 1367(a).

## FACTUAL ALLEGATIONS

9.     On or about 12-30-2014, PLAINTIFF SHEBA HOUSKIN (hereinafter Ms. Houskin) presented to the DEFENDANT HOSPITAL for prenatal care at about 4w6d gestation.

10.     Ms. Houskin was seen on several visits including but not limited to 12-3-14; 2-5-15; 2-18-15; 3-8-15; 4-7-15; 4-15-15; 5-7-15; 6-4-15; 6-9-15; 6-18-15; 7-2-15; 7-16-15; 7-21-15. Ms. Houskin was 35 years old, G2P0, with prior history of fetal demise.

11.     On or about 4-7-15, Ms. Houskin's diagnosis included abnormal quad screen, maternal pregestational diabetes, gestational diabetes, advanced maternal age (AMA) at 35+ years of age, multigravida, and obesity.

12.     Beginning on or about the prenatal visits beginning on 6-4-15 at 27w1d, and thereafter, fundal height measurements were much greater than dates, indicative of a large baby in the womb (LGA and/or macrosomia).

3

13.     On or about 6-8-15, at 29w1d, the labor plan for Ms. Houskin included beginning bi-weekly fetal surveillance at 32 weeks. At the visit, other findings included accu check 220, HA1C 7.2, advanced maternal age, BMI 30-39.9, abnormal quad screen, but the ultrasound was normal.

14.     On or about 7-2-15, 31w1d, patient was noted to be uncompliant with diabetes medications, type 2 diabetes uncontrolled, advanced maternal age, the plan included to start non-stress tests twice a week starting on 7-6-15.

15.     On or about 7-15-15, hgbA1C was increased from April to 7.2.

16.     On or about 7-16-15, polyhydramnios was charted. The plan was to do a follow up ultrasound to monitor fetal growth at 7-23-15.

17.     On or about 7-21-15 it was noted there was poor control of diabetes despite metformin, and risks discussed of diabetes in pregnancy included stillbirth and large baby greater than 8 lbs. The assessment and plan stated the patient had pregestational diabetes poorly controlled with Metformin, fundal height greater than gestational age, polyhydramnios, ultrasound scheduled for 7-24-15, biweekly antepartum testing with NST, BPP and EFW. Delivery was suggested at 38weeks or earlier. Despite this plan, estimated fetal weight was not regularly determined.

18.     On or about 7-30-15, the patient was 35w1d, fasting blood sugar range was 120-150, with 2 hour postprandial 160-180, uncontrolled type 2 diabetes. Also, it was reported that the patient was not compliant with her oral hyperglycemic medication, taking 1000mg instead of 1500mg. The patient declined insulin regimen. Patient had a 13 pound weight gain in 2 weeks and had borderline polyhydramnios with amniotic fluid index reportedly normal. At this visit, there was a discussion regarding induction of labor at 38 weeks as well as possible cesarean section for risks of shoulder dystocia.

19.     On or about 8-10-15, Ms. Houskin came to the DEFENDANT HOSPITAL reporting loss of fluid. At that time, there was a gestational age 36.5, LMP 11-21-14, with an estimated date of delivery 9-2-15 by ultrasound. She was at 36.5 weeks, sent from APT for elevated blood pressure, 5'7", 261lbs., pelvic exam 2cm / 6-% / -3 station with positive pooling and positive nitrazine, estimated fetal weight 4000 grams by bedside ultrasound. In the record, it is noted estimated fetal weight was noted in triage at 4400 grams, which is macrosomia.

20.     A Biophysical Profile (BPP) performed on or about 8-10-15 which revealed amniotic fluid within normal limits, BPP=8/8, whereas estimated fetal weight was not assessed or reported. Fetal weight should have been assessed in BPP.

21.     Given the size estimates of Ms. Houskin's unborn baby being LGA or macrosomic, the clinical signs and symptoms of both mother and baby, and the numerous risk factors for a trial of vaginal labor including but not limited to advanced maternal age, maternal pregestational diabetes, gestational diabetes, and obesity, cesarean section should have been counseled and performed. Medical literature cautions that with macrosomic babies and with babies of diabetic mothers, ultrasound underestimation of >10% estimated fetal weight is common. Additionally, the risk of shoulder dystocia and perinatal asphyxia and neonatal death is also common with macrosomic babies and with babies of diabetic mothers. Induction for vaginal labor/delivery was nevertheless performed.

22.     After the decision to induce was made, Ms. Houskin was admitted to the DEFENDANT HOSPITAL for an induction of labor and connected to an electronic fetal heart monitor (EFHM). At or about 21:12 on 8-10-15, Ms. Houskin's vaginal exam indicated she was 2 cm dilated / 60% effaced / and her unborn child was at -3 station (2/60/-3) indicating she was remote from vaginal delivery.

5

23. At or about 03:55 on 8-11-15, it was documented that Ms. Houskin was having repetitive late decelerations, which is indicative of insufficient oxygenation to the unborn baby. At that time, Ms. Houskin remained remote from vaginal delivery with a sterile vaginal exam (SVE) of 2/90/-2. Also at this time, it was documented Ms. Houskin was tacycardic.

24. During labor, Ms. Houskin had one or more episodes of tachycardia, and there were one or more episodes of late decelerations on the EFHM. Despite these findings, no change in the plan of care was made.

25. At or about 03:15 on 8-11-15, despite the ongoing documented recurrent and/or repetitive late decelerations, Pitocin was running to augment labor. Pitocin, a high alert medication, is specifically contraindicated in instances where there is a nonreassuring fetal heart rate, such as repetitive and/or recurrent late decelerations.

26. At or about 10:45 on 8-11-15, the record indicates "Intermittent late decelerations on FHT." It was also documented that "[m]aternal tachycardia still ongoing." It was further charted that there was "absence of accelerations after stimulation," "recurrent variable decelerations…," "[p]rolonged deceleration greater than 2 min, less than 10 min," "[r]ecurrent late deceleration…" Pitocin was discontinued at that time. However, there was no change made in the plan of care.

27. At or about 14:30 on 8-11-15, the nursing staff documented an indeterminate baseline, tachycardia/bradycardia, absent variability, marked variability, absence of accelerations after stimulation, recurrent variable decelerations, prolonged deceleration, recurrent late deceleration, and variable decels with other characteristics from the EFHM. The nurse, Sonya Love, R.N., documented "PT HAVING LATES, O2/SL IN PLACE WILL BCONT MONITOR." These are ominous findings clearly indicating fetal hypoxia/ischemia/asphyxia and/or acidosis *in*

*utero*. There is no evidence a physician was notified of these findings. No change was made in the plan of care.

28.     Sometime after 19:00 on 8-11-15 but before delivery on 8-12-15, Dr. Oronsaye, Ms. Houskin's primary obstetrician, was consulted regarding her "slow progress." Dr. Oronsaye "advised with continuation of Pitocin & If Not delivered by morning will do cesarean section." There is no evidence Dr. Oronsaye came to the hospital to evaluate Ms. Houskin or that he was aware of, reviewed, or was informed about the EFHM before rendering his advice. Given everything known about Ms. Houskin's condition at that time, including the nonreassuring findings on the EFHM, advising a continuation of an induction of labor of was a deviation from the standard of care.

29.     At or about 22:00 on 8-11-15, the resident documented Ms. Houskin's SVE at 6/90/+1 indicating Ms. Houskin was in "active" labor. At the same time, the resident charted the "IUPC [intrauterine pressure catheter used to monitor contractions] not working correctly." Despite the inability to reliably monitor Ms. Houskin's uterine activity and the nonreassuring findings on the EFHM, Pitocin was restarted at or about 22:00.

30.     Given gestational diabetes, clinical and/or ultrasound evidence of a macrosomic baby and the presence of non-reassuring fetal heart rate changes including late decelerations, a cesarean section should have been performed hours sooner.

31.     From 22:00 on 8-11-15 until delivery at or about 06:23 on 8-12-15, there is an absence of contemporaneous physician narrative notes. There are many "late entries" into the medical record.

32.     At or about 03:00 on 8-12-15, the record indicates Ms. Houskin was near complete at 9-10/100/+1 station. The lack of fetal descent from approximately five hours earlier is highly

indicative of cephalopelvic disproportion or a misfit. Given this finding, it should have been apparent Ms. Houskin would never deliver vaginally and a cesarean section was, again, indicated.

33. Despite the numerous warnings against vaginal delivery, Ms. Houskin was instructed to push at or about 03:00 on 8-12-15. The instruction to push before the start of second stage at 10cm was improper.

34. At or about 03:24, it is documented that "Pt stopped pushing. Wants to Labor Down. Dr. Mincks informed."

35. At or about 02:15, an addendum note indicates, "Dr. Singh and Dr. Moreland notified of status and requests patient to labor down for another hour until all staff present and ready for delivery." There should not have been delay at that time for cesarean section, there especially should not have been a delay in delivery for the convenience of the staff.

36. After the staff placed themselves, attempts at vaginal delivery were made. At or about 05:24 on 8-12-15, it was charted that the FHR [fetal heart rate] was low. However, at or about 05:30 on 8-12-15, Ms. Houskin was still encouraged to push. At or about 05:30, it was documented the Ms. Houskin's baby was crowning. It was also charted at 05:30 that attendings, Dr. Singh and Dr. Mooreland, and resident, Dr. Mincks and the nursing team were all present in the labor room.

37. At or about 05:40 on 8-12-15, it was charted "Head delivered @ 0540, loose nuchal cord noted unable to reduce by Dr. Singh/Dr. Mooreland. McRoberts Manuevuer and supra pubic pressure performed, immediately followed by Woodscrew manuevuer." The documented interventions are done to relieve a shoulder dystocia during delivery, a situation where the fetal shoulder becomes stuck behind the maternal pelvis preventing vaginal delivery. As stated above,

given Ms. Houskin's clinical history, risk factors, and the estimated fetal weight of her baby, a shoulder dystocia was foreseeable and preventable in this instance.

38.     During these interventions, the FHR continued to be ominous, indicative of fetal distress, asphyxia, hypoxia, ischemia, and the potential for fetal demise. However, attempts at vaginal delivery persisted.

39.     At or about 05:41 on 8-12-15, it was charted "Vaccum applied per Dr. Singh. Pt cont push with good effort. Pop off after approximately 5 seconds, vacuum reapplied, pt encouraged to push vacuum pop-off approximately after 5 seconds. Vacuum reapplied a third time pop-off after 5 seconds." Attempting to delivery Ms. Houskin's baby using a vacuum subjected the unborn child to additional trauma while concurrently subjecting the unborn baby to continued hypoxia, ischemia, and asphyxia, which, if untreated, will result in fetal death.

40.     At or about 05:45 on 8-12-16, it was charted "Pt continued to push, FHR attempted per external US, stat C/S called per Dr. Singh. Anesthesia notified." The fetal heart rate was not monitored during this period of time in which Ms. Houskin's baby, in utero, was suffering from hypoxia, ischemia, and asphyxia.

41.     Efforts at vaginal delivery ultimately failed and Ms. Houskin's child was delivered, via cesarean section, at or about 06:23 on 8-12-15, but it was far too late. The following entries in the record detail Ms. Houskin's child's delivery.

42.     An Operative Progress Notes indicates, "36 year old G2P0 at 37 weeks presented to APT for diabetes mellitus, advanced maternal age and abnormal quad on 8-10-15. Patient noted to have elevated blood pressure 147 / 97, 156 / 94, therefore sent to triage for evaluation. PIH labs normal however patient noted to have rupture of membranes on exam and was admitted for induction of labor. FHTs 130bpm, moderate variability, category 1, irregular contractions, sve 2

9

cm and started on Pitocin…" In other words, at the time of induction for labor, Ms. Houskin's baby's EFHM tracing was both reactive and reassuring and there was no indication of injury or death. The Note continues, "Upon the 7pm shift, patient was restarted on Pitocin and progressed from 6cm to complete in 5 hours. Category 1 tracing. Patient was pushing in McRobert's position. Baby noted to be crowning at 0530. Head delivered. Shoulder dystocia noted. Delivery of anterior shoulder attempted with gentle downward traction. Suprapubic pressure was then applied. Woodscrew maneuver was attempted; unable to perform episiotomy or delivery of posterior arm secondary to fetal head obstructing perineum. Kiwi vacuum was then applied at 0541 over the saggital suture at +3 and pressure was created with the hand pump and established in green zone at 55mmHg. Left hand applying counter pressure on the vacuum cup, right hand was used to apply gentle horizontal traction. 3 pop offs noted. Stat c-section was then called, and zavenelli maneuver was attempted; anesthesia notified. Patient was then taken to the OR was placed in dorsal supine position. General anesthesia found to be adequate, incision at 0557. Legs, followed by body delivered without difficulty. Zavenelli continued to be attempted with difficulty. Delivery of the baby at 0623." The Defendants delivered Ms. Houskin's baby, but the baby had died.

43.     This note indicates that shortly after delivery of the head at 05:30, shoulder dystocia occurred and the described steps took 53 minutes to deliver the baby, during which time the baby died. It was foreseeable that this baby would not tolerate attempts at vaginal delivery and to do so was beneath the standard of care and caused his pain, suffering and eventual terrible death. During these avoidable attempts, the baby suffered immeasurable pain and suffering, including suffocation.

44.     Another note indicates "Dr. Mincks was following patient with Dr. Moreland once patient was fully dilated as I had to attend another c section for fetal emergency and another

delivery after c section. I was called to room when head was crowning and patient was pushing. Perineum was very small. No room to perform episiotomy. All the maneuvers were performed McRoberts & suprapubic pressure could not dislodge shoulder, attempt was made to rotate baby's head & deliver posterior shoulder but was unable to reach antecubital fossa. All the maneuvers were quickly done one by one. When it failed patient was immediately taken to OR for c section. C section performed by Dr. Moreland & I was pushing head back in, Zavenelli maneuver which was extremely difficult and took long time to push it back in with help. Fetal heart activity stopped while performing Zavenelli. I & Dr. Moreland was present during the entire surgery." (Kalpana Singh M.D.)

45.     In other words, the delay in delivering the baby combined with trauma suffocated and killed him after his head was delivered.

46.     The Neonatal consult includes, "Requested by OB to attend delivery secondary to shoulder dystocia. On arrival to LDR, vacuum-assisted vaginal delivery was being attempted. Baby was not delivered after attempts done. Subsequently the mother was rushed to the OR for c-section. In the OR, the baby's lower extremities and torso were delivered. However, the head of the baby was on the introitus (vaginal), undelivered. At 0623 the baby was delivered. No vital signs were noted- no heart rate, and no respiratory effort, baby appeared blue, dusky, motionless, with soft boggy vertex of head. Baby weighed 10 pounds and 2 ounces. No resuscitation was done. Baby was pronounced expired."

47.     Ms. Houskin named her deceased son Emmanuel Deon Reeves.

48.     Contrary to and in breach of the duty owed by the DEFENDANT USA and the DEFENDANT HOSPITAL to the PLAINTIFF and the PLAINTIFF'S son, Emmanuel Deon Reeves, *in utero*, on or about August 10, 2015 through August 12, 2015, the healthcare providers

including but not limited to Kalpana Singh, M.D., Osaretin Oronsaye, M.D., Erliene Bautista, M.D., Sarika Arora, M.D., Connie Mooreland, M.D., Robert Para, M.D., Josef Blankstein, M.D., Leonard Feinstein, M.D., Abbie Mincks, M.D., Olufeyisayo Taiwo, M.D., Jeanne Chan, M.D., Janet Vincent, R.N., Naomi Brown, R.N., Rudea Downs, R.N., Lilibet Villafor, R.N.C., Sonya Love, R.N., and Carol Frey, R.N., and/or other physicians, residents, nurses, agents, servants and employees of the defendants, carelessly and negligently failed to timely deliver the unborn baby by cesarean section which proximately caused Ms. Houskin's son's head to deliver but the baby was entrapped in the birth canal, at which time and for some time before, there was a deprivation of necessary oxygen and blood flow to the baby, resulting in hypoxia, ischemia, and ultimately leading to the death of Emmanuel Deon Reeves.

49.     PLAINTIFF attaches the Affidavit of her attorney, pursuant to the provisions of 735ILCS 5/2-622(a)(2), verifying that this action has not previously been voluntarily dismissed and that the Plaintiff has been able to obtain a consultation required by 735 ILCS 5/2-622(a)(1) as Exhibit A. The report of the qualified physician is attached hereto as Exhibit B.

## Count I – CLAIMS AGAINST THE DEFENDANT UNITED STATES WRONGFUL DEATH AND MEDICAL MALPRACTICE

50.     PLAINTIFF realleges each and every allegation of their Complaint as if the same were reprinted herein.

51.     Kalpana Singh, M.D., is a licensed physician practicing obstetrics in the State of Illinois. On or about 8-11-15 and 8-12-15, Dr. Singh was the attending physician responsible for Ms. Houskin and her unborn baby.

52.     Osaretin Oronsaye, M.D. is a licensed physician practicing obstetrics in the State of Illinois. On or about 8-10-15 through 8-12-15 and before, Dr. Oronsaye was Ms. Houskin's primary care obstetrician responsible for her and her unborn child's health and safety. On or about

8-11-15, Dr. Oronsaye was consulted, assessed, and rendered opinions and advice regarding Ms. Houskin's plan of care for delivery of her unborn baby.

53.     Erliene Bautista, M.D. is a licensed physician practicing obstetrics in the State of Illinois. On or about 8-10-15 and 8-11-15, Dr. Bautista was the attending physician responsible for Ms. Houskin and her unborn baby.

54.     Sarika Arora, M.D. is a licensed physician practicing obstetrics in the State of Illinois. On or about 8-10-15 and 8-11-15, Dr. Arora was the attending physician responsible for Ms. Houskin and her unborn baby.

55.     Connie Mooreland, M.D. is a licensed physician practicing obstetrics in the State of Illinois. On or about 8-11-15 and 8-12-15, Dr. Mooreland was the attending physician responsible for Ms. Houskin and her unborn baby.

56.     As Ms. Houskin's and her unborn baby's attending physician and/or primary care physician and/or consulting physician, Kalpana Singh, M.D., Osaretin Oronsaye, M.D., Erliene Bautista, M.D., Sarika Arora, M.D., and Connie Mooreland, M.D. had an obligation and a duty to comply with the standard of care for obstetricians in managing Ms. Houskin's plan of care and her delivery.

57.     On information and belief, after assuming the care and treatment of PLAINTIFF and her unborn baby Emmanuel Deon Reeves, the DEFENDANT USA by and through its physicians and any other healthcare providers including but not limited to Kalpana Singh, M.D., Osaretin Oronsaye, M.D., Erliene Bautista, M.D., Sarika Arora, M.D., and Connie Mooreland, M.D., were then and there guilty of one or more of the following negligent acts and/or omissions:

  a.     Failure to adequately inform for and/or advocate performing a cesarean section delivery in order to avoid intrapartum hypoxic and/or ischemic and/or fetal demise and death;

b.      Failure to timely assess the intrapartum fetal status including but not limited to the fetal heart monitor tracing and changes therein which were indicative of deterioration of the fetal status including but not limited to hypoxia and/or ischemia which necessitated interventions to correct and, should said interventions fail to improve the condition, failure to perform earlier delivery;

c.      Failure to recognize evidence of fetal intolerance of labor as reflected on the external fetal heart monitor (EFHM) strip tracing, and failure to treat including but not limited to performing earlier delivery;

d.      Failure to maintain good quality electronic fetal monitoring;

e.      Failure to properly assess maternal condition including but not limited advanced maternal age, pregestational diabetes, gestational diabetes, and obesity in regards to the prospect of a vaginal birth and failing to advise the patient that a cesarean section should be performed;

f.      Failure to assess for estimated fetal weight assessments consistent with a large for gestational age and/or macrosomic infant which increases the likelihood of cephalopelvic disproportion, slow or prolonged labor, and fetal injury and/or death.

g.      Failure to adequately inform the necessary surgical staff and/or failure to perform a timely cesarean section which would have prevented injury and death to the baby, Emmanuel Deon Reeves;

h.      Failure to perform intrapartum fetal evaluations and/or interpret abnormal signs and/or symptoms and intervene earlier;

i.      Failure to assess a prolonged active stage of labor and lack of fetal descent indicative of cephalopelvic disproportion or misfit which increases the likelihood shoulder dystocia, fetal injury and/or death;

j.      Failure to avoid subjecting the unborn baby to severe traumatic forces including but not limited to iatrogenic excessive uterine activity, repeated attempts to force vaginal delivery, attempted vacuum delivery with three pop-offs, and implementing failed maneuvers such as the Zavanelli Maneuver;

k.      Failure to timely obtain consult or treatment by the patients' provider or (other) physician(s), for non-reassuring fetal status including fetal distress and failure to perform earlier delivery;

l.      Failure to carefully assess for, diagnose and treat the presence of non-reassuring changes on the fetal heart monitor, including but not limited to repetitive and intermittent late decelerations and loss of adequate variability, and treat for the

14

same including intravenous fluids, repositioning, removal or discontinuation of Pitocin, administration of oxygen, and perform for earlier delivery;

m.    Failure to recognize the need for, and implement, resuscitative measures, including but not limited to administration of oxygen, require decreasing or discontinuing oxytocin and/or Pitocin;

n.    Failure to recognize a non-reassuring fetal monitor strip and immediately advise the patients' provider or (other) physician(s) of the existence and of the nature of the non-reassuring changes including but not limited to variable, prolonged, and/or late decelerations and/or bradycardia with diminished and/or absent variability, and treat for the same including administration of oxygen, intravenous fluids, repositioning, discontinuation of Pitocin, and advocate for earlier delivery;

o.    Failure to recognize the maternal fetal misfit and/or cephalopelvic disproportion;

p.    Failure to recognize the need for a cesarean section in order to deliver the baby safely and the failure to perform an earlier cesarean section to avoid subjecting the unborn baby to prolonged hypoxia, ischemia, asphyxia, suffocation, and eventual death;

q.    Failure to comply with the manufacturer's warnings contained in the Pitocin (Oxytocin) Package Insert and/or PDR and/or FDA "black box" warning including but not limited to avoiding excessive uterine activity and/or adverse fetal heart rate changes.

58.    A reasonably prudent health care provider, operating under the same or similar conditions, would not have failed to provide to do what is listed above.

59. The aforementioned negligence in the preceding paragraphs is brought pursuant to 740 ILCS 180/0.01 *et. seq.,* "The Wrongful Death Act."

60.    As a direct and proximate result of the careless and negligent acts and omissions of the DEFENDANT USA, the PLAINTIFF'S son was caused to suffer trauma, hypoxia, ischemia and death.

61.    As a result of the delay in recognition of an unborn baby in immediate and severe distress and treatment of the same alleged above, the PLAINTIFF'S son was caused to suffer

excruciating pain, and severe suffering and disability, loss of occupation and earnings, and to incur and become liable for large sums of money.

62.     At the time of his death, the PLAINTIFF'S son left surviving as heir and dependent next of kin, his mother, SHEBA HOUSKIN who has been and forever will be deprived of his care, services, support and society and caused her to suffer severe emotional pain, mental anguish, and substantial economic losses both in the past and in the future.

63.     The breaches of the standard of care were the proximate cause of PLAINTIFF'S injuries and PLAINTIFF's son's, Emmanuel Deon Reeves, *in utero*, injuries including but not limited to, death.

64.     That Plaintiff, SHEBA HOUSKIN, as the next of kin of and the Special Administrator of the Estate of the deceased minor, Emmanuel Deon Reeves, is entitled to assert Emmanuel Deon Reeves' cause of action against the DEFENDANT USA for their medical negligence pursuant to 740 ILCS 180/2.1

65.     The aforementioned survival action is brought pursuant to 755 ILCS 5/27-6, "Actions which Survive."

### Count II – CLAIMS AGAINST THE DEFENDANT HOSPITAL WRONGFUL DEATH AND MEDICAL MALPRACTICE

66.     Plaintiff realleges each and every allegation of her Complaint as if the same were reprinted herein.

67.     Sinai Health System d/b/a Mt. Sinai Hospital or the DEFENDANT HOSPITAL advertises its facility as providing quality care and treatment to women during labor and delivery and touts the training and experience of its healthcare providers, employees, and/or agents, whether actual or apparent, to provide such care and treatment to the community at larger, including Ms. Houskin, prior to the delivery of her baby Emmanuel Deon Reeves, on August 12, 2014.

16

68. The DEFENDANT HOSPITAL had a duty to Ms. Houskin, and her unborn baby, to provide her and others with proper medical facilities, operations and treatment that meet the standard of care for hospitals providing labor and delivery services.

69. The DEFENDANT HOSPITAL, by and through its employees, agents, whether actual or apparent, and servants including but not limited to Kalpana Singh, M.D., Osaretin Oronsaye, M.D., Erliene Bautista, M.D., Sarika Arora, M.D., Connie Mooreland, M.D., Robert Para, M.D., Josef Blankstein, M.D., Leonard Feinstein, M.D., Abbie Mincks, M.D., Olufeyisayo Taiwo, M.D., Jeanne Chan, M.D., Janet Vincent, R.N., Naomi Brown, R.N., Rudea Downs, R.N., Lilibet Villafor, R.N.C., Sonya Love, R.N., and Carol Frey, R.N., owed to Ms. Houskin and her unborn baby a duty to comply with the standard of care for attending physicians, residents, or labor and delivery nurses taking care of laboring patients.

70. The DEFENDANT HOSPITAL, individually, and the DEFENDANT HOSPITAL, by and through its employees, agents, whether actual or apparent, and/or servants including but not limited to those listed above, deviated from the accepted standard of care and were then and there guilty of one or more of the following negligent acts and/or omissions

a. Failure to adequately inform for and/or advocate performing a cesarean section delivery in order to avoid intrapartum hypoxic and/or ischemic and/or fetal demise and death;

b. Failure to timely assess the intrapartum fetal status including but not limited to the fetal heart monitor tracing and changes therein which were indicative of deterioration of the fetal status including but not limited to hypoxia and/or ischemia which necessitated interventions to correct and, should said interventions fail to improve the condition, failure to advocate for earlier delivery;

c. Failure to recognize evidence of fetal intolerance of labor as reflected on the external fetal heart monitor (EFHM) strip tracing, and failure to treat including but not limited to advocacy for earlier delivery;

d. Failure to maintain good quality electronic fetal monitoring;

e.      Failure to properly assess maternal condition including but not limited advanced maternal age, pregestational diabetes, gestational diabetes, and obesity in regards to the prospect of a vaginal birth and failing to advise the patient that a cesarean section should be performed;

f.      Failure to assess for estimated fetal weight assessments consistent with a large for gestational age and/or macrosomic infant which increases the likelihood of cephalopelvic disproportion, slow or prolonged labor, and fetal injury and/or death.

g.      Failure on the part of the actual and/or apparent agents, servants, and/or employees of the hospital including nurses to inform the physicians of the fetal status sooner and to advocate for earlier delivery;

h.      Failure to utilize the chain of command to advocate for earlier delivery;

i.      Failure to adequately inform the necessary surgical staff and/or failure to perform a timely cesarean section which would have prevented injury and death to the baby, Emmanuel Deon Reeves;

j.      Failure to perform intrapartum fetal evaluations and/or interpret abnormal signs and/or symptoms and intervene earlier;

k.      Failure to utilize the chain of command when notification of concerning signs and symptoms were not immediately responded to; in other words, the health care provider(s) should have called for and obtained physician(s) to treat the patients, prepare for timely surgery, and expeditiously deliver the baby rather than to allow the baby to continue to deteriorate at a time the health care provider(s) knew or should have known that to fail to intervene with earlier delivery would substantially increase the risk of harm or death to the baby;

l.      Failure to promulgate, implement, and maintain reasonable and appropriate policies and procedures;

m.      Failure to assess a prolonged active stage of labor and lack of fetal descent indicative of cephalopelvic disproportion or misfit which increases the likelihood shoulder dystocia, fetal injury and/or death;

n.      Failure to avoid subjecting the unborn baby to severe traumatic forces including but not limited to iatrogenic excessive uterine activity, repeated attempts to force vaginal delivery, attempted vacuum delivery with three pop-offs, and implementing failed maneuvers such as the Zavanelli Maneuver;

18

o.    Failure to timely obtain consult or treatment by the patients' provider or (other) physician(s), for non-reassuring fetal status including fetal distress and failure to advocate for earlier delivery;

p.    Failure to carefully assess for, diagnose and treat the presence of non-reassuring changes on the fetal heart monitor, including but not limited to repetitive and intermittent late decelerations and loss of adequate variability, and treat for the same including intravenous fluids, repositioning, removal or discontinuation of Pitocin, administration of oxygen, and advocate for earlier delivery;

q.    Failure to recognize the need for, and implement, resuscitative measures, including but not limited to administration of oxygen, require decreasing or discontinuing oxytocin and/or Pitocin;

r.    Failure to recognize a non-reassuring fetal monitor strip and immediately advise the patients' provider or (other) physician(s) of the existence and of the nature of the non-reassuring changes including but not limited to variable, prolonged, and/or late decelerations and/or bradycardia with diminished and/or absent variability, and treat for the same including administration of oxygen, intravenous fluids, repositioning, discontinuation of Pitocin, and advocate for earlier delivery;

s.    Failure to reasonably maintain necessary and critical medical records including but not limited to the fetal monitor tracing/ strip and full delivery note and operative findings;

t.    Failure to recognize the maternal fetal misfit and/or cephalopelvic disproportion;

u.    Failure to recognize the need for a cesarean section in order to deliver the baby safely and the failure to perform an earlier cesarean section to avoid subjecting the unborn baby to prolonged hypoxia, ischemia, asphyxia, suffocation, and eventual death;

v.    Failure to comply with the manufacturer's warnings contained in the Pitocin (Oxytocin) Package Insert and/or PDR and/or FDA "black box" warning including but not limited to avoiding excessive uterine activity and/or adverse fetal heart rate changes.

w.    Failure to properly hire, retain, and/or credential physicians, residents, and/or nursing staff whose competence put patients' safety in danger;

x.    Failure to comply with JCAHO [Joint Commission on the Accreditation of Healthcare Organizations a/k/a The Joint Commission];

71.     A reasonably prudent health care provider, operating under the same or similar conditions, would not have failed to provide to do what is listed above.

72.     The aforementioned negligence in the preceding paragraphs is brought pursuant to 740 ILCS 180/0.01 *et. seq.,* "The Wrongful Death Act."

73.     As a direct and proximate result of the careless and negligent acts and omissions of the DEFENDANT HOSPITAL, the PLAINTIFF'S son was caused to suffer trauma, hypoxia, ischemia and death.

74.     As a result of the delay in recognition of an unborn baby in immediate and severe distress and treatment of the same alleged above, the PLAINTIFF'S son was caused to suffer excruciating pain, and severe suffering and disability, loss of occupation and earnings, and to incur and become liable for large sums of money.

75.     At the time of his death, the PLAINTIFF'S son left surviving as heir and dependent next of kin, his mother, SHEBA HOUSKIN who has been and forever will be deprived of his care, services, support and society and caused her to suffer severe emotional pain, mental anguish, and substantial economic losses both in the past and in the future.

76.     The breaches of the standard of care were the proximate cause of PLAINTIFF's injuries and PLAINTIFF's son's, Emmanuel Deon Reeves, *in utero*, injuries including but not limited to, death.

77.     That Plaintiff, SHEBA HOUSKIN, as the next of kin of and the Special Administrator of the Estate of the deceased minor, Emmanuel Deon Reeves, is entitled to assert Emmanuel Deon Reeves' cause of action against the DEFENDANT HOSPITAL for their medical negligence pursuant to 740 ILCS 180/2.1

78.    The aforementioned survival action is brought pursuant to 755 ILCS 5/27-6, "Actions which Survive."

WHEREFORE, the Plaintiff, SHEBA HOUSKIN, individually and as the next of kin of and the Special Administrator of the estate of the deceased minor, Emmanuel Deon Reeves, demand a Jury Trial for those counts of the Complaint that a jury trial is permitted and demand judgment against the defendants in an amount to be proven at trial, pre and post judgment interest, costs and attorney's fees and such other relief as the Court deems proper.

Dated: September 2, 2016

           SHEBA HOUSKIN, individually and as
           Special Administrator of the Estate of
           Emmanuel Deon Reeves, deceased,
           Plaintiff

           By counsel,

             s/Matthew M. Patterson _____
           MATTHEW M. PATTERSON, Esq. (6316641)
           **BEAM AND RAYMOND**
           954 W. Washington Blvd., Suite 215
           Chicago, IL 60607
           (312) 733-0930
           (312) 733-0921 (fax)
           *Attorneys for Plaintiff*

## JURY DEMAND

Plaintiff, SHEBA HOUSKIN, individually and as Special Administrator of the Estate of

EMMANUEL DEON REEVES, hereby demands a trial by jury.

Dated: September 1, 2016

<blockquote>
SHEBA HOUSKIN, individually and as Special Administrator of the Estate of Emmanuel Deon Reeves, deceased, Plaintiff

By counsel,

_ s/Matthew M. Patterson _____
MATTHEW M. PATTERSON, Esq. (6316641)
**BEAM AND RAYMOND**
954 W. Washington Blvd., Suite 215
Chicago, IL 60607
(312) 733-0930
(312) 733-0921 (fax)
*Attorneys for Plaintiff*
</blockquote>